UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Docket No.: 07 CR 688-01(SCR) |
| vs. | ) | |
| HORST HELD | ) | |
| | ) | Sentencing Date: September 4, 2008 |

SENTENCING MEMORANDUM

Prepared For:   HONORABLE STEPHEN C. ROBINSON
                U.S. District Judge

Prepared By:    Peter Tilem, Esq.
                Counsel for Defendant
                188 East Post Road, 3rd Floor
                White Plains, NY 10601
                (914) 833-9785

Assistant U.S. Attorney:   Sarah Krissoff
                           914-993-1928
                           sarah.krissoff@usdoj.gov

A. <u>Statement of the Case and Facts</u>

In 1990, Mr. Held became a licensed federal firearms dealer in Midlothian, Texas. In 1999, he started a website to sell and collect old firearms, as he had been collecting them for over 40 years. He received many admirers of his collections and received many calls and inquiries in relation to his website. In 2001, Bob Klein was one of those callers. He initiated the relationship by buying two antique guns from Mr. Held, which were legal purchases.

Thereafter, Mr. Held began what he thought was a friendship with Bob Klein. Subsequently, Klein requested that Mr. Held purchase modern guns for him to which Mr. Held originally replied in the negative. On the promise that Klein was simply waiting for his license and until receipt he would just store the firearms, Mr. Held acquiesced and began to purchase guns for Klein.

There were many emails between the two men, wherein Klein would sign off as "your friend in New York, Bob". See Exhibit A. As evidenced by the emails, the two men spoke on the phone as well. See Exhibit B. In fact, Klein shared stories of his sick father with Mr. Held. See Exhibit C. Mr. Held believed that he was simply helping out a friend and fellow gun aficionado. However, Mr. Held stopped shipping to Klein when Klein failed to produce a license.

From April 2004 through June 2004, Mr. Held shipped nine guns to Klein in New York. Klein reimbursed Mr. Held for the purchase price of each gun and paid Mr. Held an additional $50.00, as well as shipping costs for each gun.

On March 12, 2008, Mr. Held appeared before the Honorable George A. Yanthis in the Southern District and pled guilty to nine (9) counts of being a licensed importer,

shipped and transported in interstate and foreign commerce a firearm to a person other than a licensed importer, manufacturer, dealer and collector of firearms in violation of 18 U.S.C. §922(a)(2).

At this time, we are seeking a sentence of probation or house arrest with supervised release. Mr. Held is currently awaiting sentencing, as it has been postponed due to his serious health issues and inability to travel.

B. <u>Standard of Review</u>

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Court held that the United States Sentencing Guidelines ("USSG") violate a defendant's constitutional rights in two ways. First, the Act violates Sixth Amendment rights, because it requires judges, not juries, to decide facts which affect the maximum sentences to which defendants are exposed. Second, it violates Fifth Amendment rights, because it requires judges to find those facts by a preponderance of the evidence, rather than "beyond a reasonable doubt," and does not limit the sentence calculation to facts alleged in the indictment.

Prior to <u>Booker</u>, 18 U.S.C. §3553(b)(1) required a judge to impose a sentence within the guidelines unless additional facts were found by the court, and required the applicable guideline range to be determined and thus increased, enhancement by enhancement, on the basis of non-jury fact finding. In <u>United States v. Fanfan</u>, 543 U.S. 220 (2005), the majority applied a severance analysis to determine that the proper judicial remedy for this unconstitutionality is not to strike down the entire statutory scheme (including the guidelines), and not to engraft additional protective procedures onto the present scheme (e.g., jury trial of guideline enhancements), but rather to "excise" the particular provisions of the statute which it found to create the unconstitutionality-

§3553(b)(1)(which makes a guideline sentence mandatory unless a departure can be justified on the basis of judicial fact finding) and §3742(e)(which sets forth the strict standards of appellate review). Fanfan leaves in place, as the binding law of federal sentencing, principally §3553(a) of Title 18.

Therefore, the guidelines are now advisory and the Court should consider, along with the Guidelines, the factors as set forth in §3553(a) and impose a sentence which is "sufficient but not greater than necessary" and sentence Mr. Held to probation or house arrest to achieve the broad social purposes of sentencing described in §3553(a)(2).

C. Sentencing Guideline Issues

Pursuant to the stipulation agreement there is no dispute that according to the Guidelines, Mr. Held's offense level is 13 with a Criminal History Category of I and that the Sentencing Guideline range is 12-18 months. However, the parties further stipulated that either party may seek a sentence outside of the Stipulated Guideline range and ask the Court to consider imposing a sentence based upon the factors as set forth in 18 U.S.C. §3553(a).

D. 18 U.S.C. §3553(a) Factors

Under the factors set forth in 18 U.S.C. §3553(a), we respectfully submit that a straight probationary sentence or house arrest is appropriate for defendant. As the Supreme Court made clear in Rita v. United States, 127 S.Ct. 2456, 2466 (2007), there is no presumption at the district court level in favor of a Guideline sentence and the district court's focus should not be on imposing a "reasonable" sentence; rather, this court's mandate is to impose "a sentence sufficient, but not greater than necessary," to comply with the basic aims of sentencing. Id. (quoting §3553(a)'s "parsimony provision,"

4

emphasis added). In this case, that analysis strongly supports imposing a sentence of probation or house arrest.

In reviewing factors as set forth in §3553(a), we ask the Court to consider them, along with the advisory Guidelines, in three general categories: the nature of the offense, the history and character of the defendant, and the needs of the public and the victims of the offense.

(1)     In considering the nature of the offense, one must look at the background setting of how the offense came to fruition. The offense originated in Texas where Mr. Held has resided for the past twenty-six (26) years. In Texas, unlike New York, guns are a part of the Texas culture and moreover a way of life for most Texans.[1] Moreover, the gun laws are more liberal. So liberal in fact, that Texas has some of the least restrictive gun laws in the nation: a state resident does not need a permit to buy a gun and guns do not have to be registered. In fact, the United States Supreme Court, in its most recent decision on gun laws, explicitly said the Second Amendment protects an individual's right to gun ownership. District of Columbia v. Heller, 128 S.Ct. 2783 (2008). Texas, along with thirty other states, urged the court to strike down the Washington D.C. handgun ban. While the high Court's recent ruling does not absolve Mr. Held's crime in anyway it does mitigate the intensity of the purpose in that Bob Klein, the purchaser has a constitutional right to own the guns.

---

[1] It is not unusual for a Texan to be casually conversant about firearms. A state resident does not need a permit to buy a gun and guns do not have to be registered. Police are, as a result, not sure how many guns there are in the state. But the number is substantial. In a 2001 poll by the Behavioral Risk Factor Surveillance Survey, 36% of respondents said that their household had at least one. ... The Economist, *Gun laws in Texas* http://www.economist.com/world/na/displaystory.cfm?story_id=9044921 (Apr 19, 2007).

However, Mr. Held's culpability can be mitigated by the fact the he did not act for personal gain. Under §3553(a) and the decisions of the Supreme Court, a sentencing court may properly consider a defendant's motive. <u>Wisconsin v. Mitchell</u>, 508 U.S. 476, 485 (1993) (stating that "the defendant's motive for committing the offense is one important factor"). In the present case, Mr. Held's motive was merely to help a person he considered a friend and fellow gun collector, someone with whom he shared a passion for firearms. In fact, the ATF reviewed all of Mr. Held's files, emails, and gun accounts, over a three year period and nowhere did they find any type of illegal activity except for the dealings with Klein. Moreover, his profit was de minimis in that he only charged $50.00 per gun. This was not a man making a "profit", he was merely covering his time and costs in helping Klein. While Mr. Held's actions were unlawful, his intent was benign.

(2)   If the Court should consider the second general category - the history and character of defendant; these factors weigh heavily in Mr. Held's favor. He is a devoted family man, being married to his wife for over forty-six (46) years with two grown daughters. As this Court is aware, based upon the numerous adjournments of sentencing for medical reasons, Mr. Held is a very sick seventy (70) year old man. Approximately ten year's ago he was diagnosed with diabetes and hypertension. Since the time of Mr. Held's plea, he has suffered numerous setbacks in his health battle with the diabetes. In January 2006, an infection on his right foot led to a partial amputation. Following the surgery, Mr. Held was treated for edema of his right foot resulting in medication and diabetic shoes. However, in October 2007, an ulcer at the amputation site had worsened and it was determined that further amputation of the right foot was necessary. He

required treatments on a regular basis at the doctor's office until March 2008. While it was originally believed that Mr. Held was healing well from the surgery, he developed problems with his eyes and loss of vision. He was then given a course of treatment by a retina specialist. However, the treatment was unsuccessful and Mr. Held had to undergo eye surgery on June 23, 2008. At this time, he is facing a six week recovery with weekly doctor visits. To impose a sentence of incarceration at this time would be devastating to Mr. Held's health. (Attached as Exhibit D are relevant portions of Mr. Held's medical records).

In addition, when the ATF auditors finished reviewing all of Mr. Held business records, it was determined that he had done no other wrongdoing then selling the firearms to Klein. Subsequent to his arrest, he sold some of his firearms to dealers and the rest he sent to an auction, where he was set to lose a considerable amount as the auctions charge a fee of twenty-five percent (25%). Thereafter, he turned in his books and license to the proper authorities. Thus, he no longer has a means to make a living and currently lives on the little he receives from Social Security.

(3)     In looking at the third general category which is the needs of the public to be protected from further crimes of the defendant and the victims of the offense to be provided with restitution, these factors also put Mr. Held in a favorable position.

Mr. Held's motive for committing the crimes charged was to help a friend; he was not seeking to personal gain from his crimes and certainly did not intend to harm anyone. Moreover, the evidence shows that Mr. Held only committed the crimes in assisting Klein, though he had numerous other buyers and gun deals, he did not ship and transport a firearm to any other person who was not licensed.

Furthermore, the offense in question occurred in April through June of 2004. There is no evidence that Mr. Held engaged in any further conduct outside the law since this offense. Moreover, Mr. Held independently stopped transacting on behalf of Klein even prior to any investigation or indictment, after it became apparent that Klein was not getting a license as promised. Mr. Held did not flee his home after the offense and in fact took immediate responsibility for his actions when he pled guilty after giving timely notice to the United States Attorney.

In addition, since his indictment in July 2007, Mr. Held has been supervised by pretrial services in Dallas. Mr. Held has been a model supervisee. He has reported when required and complied with all terms and conditions of his release for the last year.

Based on the foregoing, it is unlikely that the defendant would be a recidivist and most improbable that he poses any further threat to society. Additionally, there is no victim to whom Mr. Held owes restitution. Therefore, there is no need to afford adequate deterrence or to protect the public from further crimes of the defendant. 18 U.S.C. §3553(a)(2).

E. Conclusion

The evidence suggests that Mr. Held is an appropriate candidate for probation or house arrest. By not engaging in criminal conduct for the last four years, his age and serious health factors, and his ability to comply with pretrial release all show Mr. Held has rehabilitated himself since this offense. This too should be considered as a factor weighing in favor of a sentence at below the minimum base level.

When reviewing the facts of the case and the surrounding circumstances, the totality of the circumstances warrant a sentence of some form of probation or house

arrest. <u>United States v. Sabino</u>, 274 F.3d 1053 (6th Cir. 2001); <u>United States v. Gale</u>, 188 F.3d 354 (6th Cir. 1999); <u>United States v. Rivera</u>, 994 F.2d 942 (1st Cir. 1993). Most importantly, for the foregoing reasons, Mr. Held respectfully submits that a sentence of probation or house arrest is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. §3553(a).

Respectfully submitted,

PETER H. TILEM, ESQ.

9

Exhibit A

Subj:    **Re: # 17455175 cutom powell knife/ combo**
Date:    4/9/2004 3:21:09 AM Eastern Daylight Time
From:    held@ectisp.net
To:    Miclore777@cs.com
Received from Internet: click here for more information

Dear horstheld,

This is a confirmation of your bid at GunBroker.com. The item you bid on is:

Item Number: 17455175
Item Title: PKP Custom Powell knife pistol 38 special
Ending Date: 04/12/2004 11:21:56 PM

Your maximum bid is: $500.00
Your posted bid may be less than your maximum bid shown above due to our
AutoBid bidding proxy. For information on AutoBid please visit our Help Center.

**Hello Bob,
to fetch his address I also sent him a message asking for his best price,
Horst**

www.horstheld.com


----- Original Message -----
**From:** Miclore777@cs.com
**To:** held@ectisp.net
**Cc:** MICLORE7@aol.com
**Sent:** Friday, April 09, 2004 2:12 AM
**Subject:** # 17455175 cutom powell knife/ combo

    Hi Horst, there is a custom knife/ combo auction I would pay up to $725.00 it is now at a $500.00 opening. the no. ( # 17455175 ) since nobody has expressed any interest for a few days that i have seen since, the listing started. maybe this item could be bought right. it was offered to me at either at $1200.00 or $1800.00 at the Atlanta knife show 2 1/2 years ago. i can't remember which price it was but I'm ready to pay up to the $725.00.
    why don't you see if we can buy this right. if the $725.00 has still not met the reserve maybe an email might do some good because he opened low at the $500.00.
I think it's very possible that he has to sell it.
so, see please do what you can do for me on this item, It is very nicely made & would make a nice additian to my collection if we can buy it right. I leave it in your hands if it,s not too much trouble. much thanks,
                      you friend in NY,    bob

Case 7:07-cr-00688-SCR    Document 16    Filed 09/03/2008    Page 12 of 19

**Exhibit B**

Subj: **Re: receipt**
Date: 4/16/2004 7:06:19 AM Eastern Daylight Time
From: Miclore777
To: held@ectisp.net

Hi Horst, I would like a 22 that is very small and light & especialy thin.. here are some num. in the auto section. 1) #17600054 sedco looked sm., thin.
    2) #17530240 astra (a few others listed)
    3) #17534873 950 BS ber.If could get for $260 should
      I buy anyway or in addition to another. Because
      it is ( good, cheap, new ???)
    4) #17429284 (Brevetto)
Or perhaps something that is thin and light thru your distrib. since they are not too high maybe i should get 1 type that is thin and light & another small, heavy but good for long lasting . for collibri rounds in basement & woods.
I leave It in your hands if I may For which to buy & how much to pay. i know that i just want a short barrell becass i have the target already if you recall.
Horst email me to call you at a good time for you or give me a 1min. call so, i can call you right back or emails. what ever way makes it better for you
 thanks my friend, i guess we will chat today some time. I await herrring from you!
                                      guess who

Friday, April 16, 2004    CompuServe: Miclore777

**Exhibit C**

| | |
|---|---|
| Subj: | **FYI** |
| Date: | 6/1/2004 9:48:38 PM Eastern Daylight Time |
| From: | held@ectisp.net |
| To: | MICLORE7@aol.com |

Sent from the Internet (Details)

Hello Bob,
though like always immediately paid nothing showed up.
***Also your letter for the following is missing:***

**Open are the following:**
**Item Number:** 18387246
**Item Title:** American Derringer D/A 38
**Ending Date:** 05/11/2004 9:03:29 PM
**Quantity Won:** 1
**Winning Bid:** $245.00 (per item)
+ shipping 20 + transfer 50 = 315.

**Meanwhile I received the invoice for the German derringer =**
220 + 50 = 270.
Please take care for the $585.,

Horst
www.horstheld.com


----- Original Message -----
**From:** MICLORE7@aol.com
**To:** held@ectisp.net
**Cc:** Miclore777@cs.com
**Sent:** Tuesday, June 01, 2004 8:27 PM
**Subject:** (no subject)

    hi horse, the guy's arrived last week, it was nice to see them. my dad has been in the hospital and i brought him to his home today. he went in to the hospital 8 days ago with a combination of congestive heart failure and newmonia.his vital signs were all close to flat line as the ambulance crew started working on him in his home prior to taking him to the hospital it was much too close for comfort & he has amazed everybody again. he's like the cat with nine lives. anyway thank God this was not his last visit & it looks like we will be celebrating his 86th in August. it was a very long week to say the least.
    have any of the large items show up? those can go one at a time even if it cost me a little more in freight please keep me posted.    bob

Wednesday, June 02, 2004 America Online: MICLORE7

Exhibit D

# Ellis County
## Foot and Ankle

David A. Gardner, DPM

May 30, 2008

**RE: Held, Horst**

To Whom It May Concern:

I first saw Mr. Held on January 09, 2006 when he presented to my office with an ulcer on the right hallux. The ulcer was of significant size and probed to bone. The ulcer was approximately 2 cm in size with purulent drainage. The ulcer was cultured. Mr. Held was placed on oral antibiotics and a MRI was ordered on the right foot.

The culture revealed staphylococcus aureus, beta hemolytic strep and enterococcus. The MRI revealed osteomyelitis in the distal phalanx of the right hallux.

On January 18, 2006, Mr. Held underwent amputation of the distal phalanx as well as the distal portion of the proximal phalanx of the right hallux at Ennis Regional Medical Center in Ennis, TX.

Mr. Held's post operative course was complicated by dehiscence of the surgical site and localized soft tissue infection. The surgical site was healed by the May 10, 2006 visit.

Mr. Held was seen in the office several times for diabetic foot care following his surgical course. He has been treated for edema in his right foot. This edema made it difficult to wear shoes. Mr. Held was treated with non steroidal anti-inflammatory medications and diabetic shoes.

Mr. Held was seen in the office on October 10, 2006 for an ulcer on the plantar aspect of the prior amputation site. This ulcer was treated with local wound care and oral antibiotics.

On October 02, 2007, Mr. Held presented to the office for follow up on the ulcer which had previously shown signs of healing now had become considerably worse. On this visit, an MRI was ordered of the right foot.

On October 17, 2007, I discussed the results of the MRI which revealed osteomyelitis in the remaining proximal portion of the right hallux. Mr. Held and I decided to proceed with amputation of the remaining infected bone in the right hallux.

1441 South Midlothian Parkway, Suite 120, Midlothian, TX 76065, Phone: 972-723-5400, Fax: 972-723-5401

# Ellis County
## Foot and Ankle

David A. Gardner, DPM

On November 16, 2007, Mr. Held underwent amputation of the proximal phalanx of the right hallux at Baylor Medical Center – Ellis County. The surgery was uneventful and the patient tolerated the procedure and anesthesia well. The patient was then placed on IV antibiotics.

During Mr. Held's postoperative course, the surgical site dehisced and then had to heal by secondary intention. This required him to remain non-weight bearing on his right foot for a significant amount of time. Mr. Held was treated in my office from the surgical date until March 13, 2008 on a regular basis with local wound care and antibiotics. Mr. Held developed an ulcer on the lateral aspect of the right foot during his post operative course. This site also had to be treated with local wound care both in my office and with home health care.

Mr. Held continued to improve. On March 13, 2008, I released him from home health. At this time, Mr. Held's surgical site and lateral ulcer site had healed. I advised him to continue with the surgical shoe and to continue to restrict his ambulation to activities of daily living. Mr. Held was released to travel if necessary.

Mr. Held was seen in the office on April 15, 2008. Both the surgical site and the lateral ulcer site were healed. We discussed shoe gear and the possibility of placing him in a diabetic shoe with a rocker bottom sole and filler for the hallux area.

I will continue to see Mr. Held on a regular basis every 2 months for diabetic foot care.

Please call with questions regarding this summary of Mr. Held's chart notes.

Sincerely,

David A. Gardner, DPM

# WELCOME TO IRVING COPPELL SURGICAL HOSPITAL

United Surgical Partners International, Baylor Medical Center at Irving, and a group of physicians have joined together to establish Irving Coppell Surgical Hospital. Our mission is to provide first-class surgical services for the local community in a safe, comfortable and welcoming environment; one in which we would be happy to treat our own families. We provide Surgical Services for both outpatient and inpatient surgery patients. We also provide Imaging Services, including MRI, CT scans, Ultrasound, and Diagnostic Radiology.

## PLEASE NOTE THE FOLLOWING IMPORTANT DATE AND TIMES:

| | |
|---|---|
| SURGERY/PROCEDURE DATE: | Monday June 23, 2008 |
| TIME OF ARRIVAL TO THE HOSPITAL: | 9:00 AM |
| TIME OF SURGERY/PROCEDURE: | 11:00 AM |
| TYPE OF SURGERY/PROCEDURE: | Traction Retinal Detachment |

### Preadmission Information

- The Pre-Admission Nurse will call you before your scheduled procedure. She will ask about your health history, medications you are presently taking, and arrange any laboratory or EKG testing and/or x-rays you may need prior to the date of your procedure.
- Patients are expected to pay their co-pays and deductibles on or before the day of service. Our Business Office staff will notify you by telephone of the anticipated amounts.
- Arrive at the hospital on the day of your procedure at the time instructed by your physician.

### Admission Information

- Please check in for any pre-admission testing and on the day of surgery at the Registration Desk at the South Entrance of the hospital. Have your insurance cards(s) and driver's license or other identification available. Bring any paperwork received by your doctor's office.
- Bring a copy of your Medical Power of Attorney if you are unable to sign your own admission forms.
- If you are unable to understand or read English easily, Irving Coppell Surgical Hospital will provide an interpreter to serve you. Or, you may prefer to bring a family member or friend to serve as an interpreter during your hospital stay.
- Pediatric Patient: Bring guardianship verification if a child does not reside with a parent.

The Registration Coordinator will review your pre-admission information and complete the brief check-in process.
- A wheelchair escort is available to take you to the Surgery Department.
- The Surgery Department is located by the East and North Entrances of the hospital.
- You or a family member may wish to move your car closer to the Surgery Department after you have registered on the day of surgery.
- Please call the numbers listed below if you have any questions regarding this process:
Administration: 972-868-4000    Surgery Registration:    972-868-4066    Radiology:    972-868-4150

### Important Pre-Surgery Instructions

- Do not eat or drink after midnight the night before your scheduled surgery. This includes no coffee, water, gum, hard candy, tobacco or ice. Drink lots of liquids the day before your procedure so you will be well hydrated.
- Do not drink alcohol 24-hours prior to surgery or smoke 12-hours prior to surgery.
- Pediatric Patient: Bring an empty bottle or sippy cup, pacifier, soft toy or blanket and an extra diaper.
- Notify your physician if you develop a cold, cough, fever or illness prior to your procedure.
- Take your blood pressure, heart and anti-seizure medication(s) with a tiny sip of water the morning of your surgery if you normally take them in the morning.
- Do not take your insulin or diabetic medication the morning of your surgery unless instructed by your doctor.
- Consult your physician about taking any blood thinners (like Coumadin, ASA, Plavix).
- Bring your inhalers, C-PAP or Bi-PAP unit to the hospital for both outpatient and inpatient surgery.
- Eye Surgery Patient: Bring your eye drops.

Continued on page 2.